IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FIRSTMERIT BANK, N.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 6000 |
| | ) | |
| ANCHOR PROPERTIES, INC. and | ) | |
| EMIN TULUCE | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff FirstMerit Bank, N.A. ("FirstMerit") has filed a sixteen count "Complaint for

Foreclosure and Other Relief" (Dkt. No. 2, "Compl.") against defendants Anchor Properties, Inc.

("Anchor") and Emin Tuluce ("Tuluce") (collectively "Defendants"). FirstMerit brings claims

for breach of contract, foreclosure on actual mortgages, and foreclosure on equitable mortgages,

based on a labyrinth of contracts between Defendants and Midwest Bank and Trust Company

("Midwest"). FirstMerit purchased Midwest from the Federal Deposit Insurance Corporation,

which had placed Midwest into receivership. (Compl. ¶ 2.)

Before the court is "Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)"

(Dkt. No. 20, the "MTD"). Defendants seek to dismiss Counts II, IV, and VI of the Complaint,

claiming that Midwest and Defendant Anchor did not enter into valid mortgages capable of

supporting a foreclosure. (MTD at 8.) Defendants argue that Counts X, XI, and XII should be

dismissed, arguing that FirstMerit seeks to enforce fraudulent and ambiguous agreements

between Midwest and Anchor. (*Id*. at 7.) For the reasons stated in this order, the court denies

Defendants' motion.

<u>BACKGROUND</u>

When ruling on a motion to dismiss, a court must accept as true all well-pleaded allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011) (quoting *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009)). Accordingly, this court accepts the allegations in FirstMerit's Complaint as true in articulating the relevant background facts below.

In May and August, 2007, Midwest entered into three loan agreements with entities not involved in this lawsuit (the "Entities"). (Compl. ¶ 8.) Under these loan agreements, Midwest loaned the Entities $4,040,000.00, and the Entities granted Midwest mortgages on three properties: 4471 Lawn Avenue in Western Springs; 187-191 North York Road in Elmhurst; and 410 Chestnut Street in Hinsdale (collectively the "Properties"). (*Id.* ¶¶ 8-10.) The Entities failed to repay this loan, and Midwest instituted foreclosure proceedings against the Properties. (*Id.* ¶ 19.)

With these foreclosures pending, Midwest in June 2008 entered into an agreement with Defendant Anchor, where Midwest loaned $4,027,550.68 to Anchor. (*Id.* ¶ 12.) Anchor in turn used these proceeds to purchase from Midwest the loan documents the Entities entered into for the Properties. (*Id.* ¶¶ 11-12.) In essence, Midwest loaned Anchor the funds to step into Midwest's shoes and hold the mortgages for the Properties.

The transactions between Midwest and Anchor were memorialized in multiple loan documents. First, the parties entered into a Business Loan Agreement where Midwest loaned $4,027,550.68 to Anchor. (*Id.* ¶ 12.) Second, Anchor executed a Promissory Note in favor of Midwest for $4,027,550.68 (the "$4.027 Note"). (*Id.* ¶ 13.) Third, the parties entered into an agreement where Anchor purchased the Entities' loan documents for the Properties from

Midwest at a price of $4,027,550.68. (*Id.* ¶ 11.) Finally, Anchor executed Collateral Assignments of Note and Mortgage Documents ("Collateral Assignments" or "Assignments"). In the Collateral Assignments, Anchor secured the $4.027 Note, by granting Midwest a security interest in the Entities' notes and mortgages for the Properties. (*Id.* ¶ 15.)

Following the execution of these documents, Anchor took over for Midwest the pending foreclosures of the Entities' mortgages. (*Id.* ¶ 20.) Under the Collateral Assignments, once Anchor could sell the property at a foreclosure sale, Anchor had to first obtain Midwest's written consent to the transaction. (*Id.* ¶ 17 (quoting Compl., Exs. G, H, I ¶ 6).) Midwest could condition its consent upon a demand to receive a first priority mortgage on the Properties after the sale. (*Id.*) In the event Anchor purchased the Properties in foreclosure, Anchor was required to deliver first priority mortgages to Midwest. (*Id.*) If Anchor failed to grant Midwest first priority mortgages, the Collateral Assignments themselves, by their own terms, were to be deemed mortgages on the Properties in favor of Midwest. (*Id.*)

Anchor did obtain a judgment of foreclosure and sale against the Properties; however, Anchor did not seek Midwest's consent to these sales. (*Id.* ¶¶ 21-23, 26.) Anchor was the high bidder and obtained possession of the Properties at these sales; however, Anchor failed to execute or deliver the contemplated first priority mortgages on the Properties. (*Id.* ¶¶ 25-27.)

Counts II, IV, and VI of FirstMerit's Complaint (Dkt. No. 20) seek to foreclose on each of the respective Properties. FirstMerit argues the Collateral Assignments converted into enforceable mortgages, because Anchor sold and purchased the Properties in foreclosure and failed to grant Midwest first priority mortgages. (Pl's Opp'n to Defs' MTD, Dkt. No. 28, at 7, the "Opp'n".) Defendants respond by largely arguing that provisions in the Collateral Agreements cannot convert the agreements to mortgages capable of being foreclosed upon.

Additionally, in June 2008, Midwest loaned another $400,000.00 to Anchor. (*Id*. ¶ 28.) This loan was evidenced by a promissory note that was restated by later promissory notes. (*Id*.) The last of these notes (May 5, 2010) included a provision requiring Anchor to perfect security interests in the Properties (the "$400,000 Note"). (*Id*. (citing Compl., Ex. J).) On the same day, Anchor executed second priority mortgages on the Properties in favor of Midwest. (*Id*. ¶ 31.) These second priority Mortgages clarify that they secure the $400,000 Note. (*Id*. (citing Compl., Exs. M, N, 0).)

Counts X, XI, and XII of the Complaint seek to foreclose upon the Properties, because Defendants failed to pay back the $400,000 Note. (Opp'n at 2.) Defendants argue that these claims should be dismissed because Defendant Tuluce never intended to secure the $400,000 Note with mortgages on the Properties. (MTD at 14-15.) Defendants also argue that whether the $400,000 Note secures the properties is ambiguous and that this ambiguity should be resolved against FirstMerit as successor to the note's drafter Midwest. (MTD at 15.)

## LEGAL STANDARD

As stated earlier, under the Federal Rules of Civil Procedure, when deciding a Rule 12(b)(6) motion, the court "construe[s] the . . . [c]omplaint in the light most favorable to Plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in his favor." *Cole*, 634 F.3d at 903. A complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

However, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Though "detailed factual allegations" are not

required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555.

The complaint must "include sufficient facts 'to state a claim for relief that is plausible on its face.'" *Cole*, 634 F.3d at 903. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

ANALYSIS

1.   Counts II, IV, and VI- Foreclosure of the Properties Based on the Collateral Assignments

Again, in Counts II, IV, and VI, FirstMerit seeks to foreclose upon the Properties, based on Anchor's failure to comply with the Collateral Assignments. According to FirstMerit, because Anchor did not deliver mortgages upon its sale and purchase of the Properties in foreclosure, the Collateral Assignments automatically convert to mortgages. (Opp'n at 7.) FirstMerit's allegations rely on the following provisions in the Collateral Assignments.

First, Plaintiff alleges all three Collateral Assignments for each of the three Properties state the following (Compl. ¶ 17):

> [Anchor] shall not, without first obtaining [Midwest's] written consent to the terms thereof: (a) sell (or cause the sale) of the Mortgaged Property, including sales by court order pursuant to a judgment of foreclosure . . . In all cases,[Midwest] may condition its consent to the foregoing on the delivery by [Anchor] of a separate first priority mortgage against the Mortgaged Property to become effective and to be recorded immediately upon [Anchor] becoming the title holder to the Mortgaged Property in order to secure the repayment of the [Anchor] Note.

The Complaint then quotes the following from the Collateral Assignments (*Id.* ¶ 18):

> IN THE EVENT BORROWER TAKES TITLE TO THE MORTGAGED PROPERTY AND FAILS TO DELIVER THE REQUIRED SUBSTITUTE MORTGAGE (AND RELATED DOCUMENTS), THIS AGREEMENT SHALL BE CONVERTED INTO AND SHALL BE DEEMED A MORTGAGE UPON BORROWER'S INTEREST IN THE MORTGAGED

PROPERTY (AND ALL RENTS, PROCEEDS AND PROFITS THEREFROM) IMMEDIATELY UPON BORROWER'S ACQUISITION THEREOF.

According to FirstMerit, the implication from these provisions could not be clearer. Anchor could not sell or purchase the Properties, at a judicial foreclosure sale, without executing a first priority mortgage on them in favor of Midwest. (Opp'n at 6-7.) If Anchor failed to deliver these mortgages, the Collateral Assignments were to convert to mortgages automatically. (*Id.*) The complaint alleges Anchor sold and purchased the Properties at a judicial foreclosure sale, and then failed to deliver the first priority mortgages to Midwest. (*Id.*) Thus, FirstMerit argues the well-pled facts of the complaint establish that the Collateral Assignments are now enforceable mortgages. (*Id.*)

In spite of these provisions, Defendants seek to benefit from their alleged failure to obtain consent, avoid conversion of the Collateral Assignments to mortgages, and have Counts II, IV, and VI dismissed. Defendants set forth a handful of legal theories that must fail. This court will respond to Defendants' theories in the order Defendants set them out in their papers.

At the outset, this court sets aside statements Defendants made in their briefing that are unhelpful in deciding a motion to dismiss. Defendants loudly air various grievances against Midwest that raise fact issues outside of the complaint. Most of these allegations revolve around whether Midwest conned Defendants into acquiring the loans for the Properties.[1] Since this court cannot possibly comment on these supposed facts without the benefit of discovery, we

---

[1] *See, e.g.*, MTD at 3 (stating Midwest's "coercive tactics related to the solicitation of these loans" was "really 'arm twisting' and high pressure tactics"); *id.* at 4 (claiming that Midwest is guilty of "conning Tuluce into acquiring the three severely distressed loans" on the Properties); *id.* at 4-5 (alleging "Midwest Bank engaged in a scheme to dump the troubled loans and fraudulently induce [Tuluce] to take over the loans" on the Properties, by "forging his name" and "misrepresenting the nature of the documents they were having Tuluce sign").

exercise our discretion to ignore these allegations while deciding the present motion. Fed. R. Civ. P. 12(d); *see also DeLeon v. Beneficial Const. Co.*, 998 F. Supp. 859, 862 (N.D. Ill. 1998).

In the first of Defendants more substantive arguments, they note that Anchor never granted Midwest a security interest in the Properties themselves. (MTD at 8; Defs' Reply, Dkt. No. 30, at 6, the "Reply"). Instead, according to Defendants, FirstMerit received the following: (1) under the $4.027 Note, a security interest in the Collateral Assignments; and (2) under the Collateral Assignments a security interest in "the mortgage, note and other loan documents related to the loan that Plaintiff had sold to Defendants for the respective Foreclosed Property." (MTD at 9.) From these observations, Defendants argue that these security interests cannot be converted into mortgages under Illinois law capable of supporting a foreclosure. (*Id*. at 9-10 (citing *Quinn v. Pullman Trust & Sav. Bank*, 240 N.E.2d 791 (Ill. App. Ct. 1st Dist. 1968); *Shefner v. Univ. Nat'l Bank*, 353 N.E.2d 126 (Ill. App. Ct. 1st Dist. 1976).)

The authorities Defendants cite do not support their claim that FirstMerit's security interests, as a matter of law, could never convert to mortgages by contract. In *Quinn*, plaintiff created a land trust of real estate, borrowed funds from defendant bank, and pledged their beneficial interest in the land trust as security for the loan. 240 N.E.2d at 792. If the borrowed funds were not paid back, the note evidencing the loan gave defendant the power to sell the assets without various procedural protections commonly provided in a foreclosure. *Id*. When default occurred, defendant sold the properties, and plaintiff sued claiming the instruments were a mortgage, the sale was a foreclosure, and therefore an accounting was required. *Id*. at 792-93. The Illinois Appellate Court upheld summary judgment for the defendant, in part, because "the instruments executed between the parties showed that their intention was to create effective land trusts with subsequent pledges of the trust beneficial interests only." *Id*. at 793.

The *Shefner* case followed a similar fact pattern. Plaintiff created a land trust, borrowed money from defendant, and assigned a beneficial interest in the trust as security for the loan. 353 N.E.2d at 127-28. When the note evidencing the borrowed funds became past due, defendant notified plaintiff of its intent to sell the property. *Id*. at 128. Plaintiff sought to categorize the loan transaction as a mortgage to take advantage of a statutory right of redemption, but the Illinois Appellate Court held that the assignment of the beneficial interest in the land trust to secure a note did not automatically convert to a real estate mortgage. *Id*. at 979-80.

When comparing the facts of these cases to the present case, Defendants' first argument that assignments are security interests and not mortgages misses the mark. As FirstMerit correctly argues, the transfer documents in *Quinn* and *Shefner* did not expressly state that the documents were mortgages or were to convert to mortgages in certain scenarios. (Opp'n at 8.) In fact, based on these Appellate opinions, the parties were presumably attempting to accomplish the exact opposite of the parties here. The *Shefner* and *Quinn* defendants secured their notes by a beneficial interest in a real estate trust, instead of a mortgage, so if default occurred they could sell the property without a foreclosure.

Here, as alleged by FirstMerit, the parties drafted agreements attempting to opt-in to the mortgage and concomitant foreclosure regimes by converting a security interest into a mortgage. (Compl. ¶¶ 17-18.) Thus, the issue this case presents is not as Defendants would have it based on their interpretation of *Quinn* and *Shefner*, or whether security interests can ever support a mortgage as a general matter. (MTD at 8.) This case presents a much more narrow issue: Can

commercial parties, involved as repeat players in the commercial real estate business, contract to convert security interests into mortgages in certain scenarios?[2]

Because Defendants have set forth no legal or normative arguments for why this practice should be prohibited as a matter of course, this court relies on general principles of Illinois contract law to find that such a conversion is permissible when evidence by a specific writing and importantly among sophisticated commercial parties. *See, e.g.*, *Am. Country Ins. Co. v. Cline*, 722 N.E.2d 755, 976 (Ill. App. Ct. 1st Dist. 1999 ("The laws and public policy of the State of Illinois permit freedom of contracting between competent parties.") (citing *Elec. Contractors' Ass'n v. A.S. Schulman Elec. Co.*, 63 N.E.2d 392 (Ill. 1945) (same)).

In a similar vein, Defendants next argue that Counts II, IV, and VI must fail, because at the time the Collateral Assignments were executed Anchor did not own the Properties, did not have the ability to mortgage them, and only obtained their interest in the Properties at a subsequent foreclosure sale. (Opp'n at 10.) Defendants attempt to support this argument by citing authority allegedly standing for the proposition that mortgages must be fixed at the time of delivery. (*Id.* (citing *Williams v. Griffith*, 35 N.E.2d 95 (Ill. App. Ct. 4th Dist. 1941); *Brust v. Brust*, 89 N.E.2d 897, 900 (Ill. 1951).)

Again, Defendants' argument here misses the point. FirstMerit does not allege that Anchor could grant a mortgage in the Properties at the time the Collateral Agreements were entered into. Rather, FirstMerit alleges that Midwest contracted for the power to force

---

[2] This court is comfortable holding Defendants to this standard for the present motion based on their own statements. *See, e.g.*, MTD at 2 ("Tuluce had been involved in buying, selling, brokering, owning, leasing and managing commercial real property since at least 1999."); *id.* (Tuluce "refinanced the first mortgage indebtedness encumbering five commercial properties" with Midwest); *id.* at 2-3 (Tuluce's projects with Midwest involved "the acquisition of distressed commercial properties" requiring "the expertise to rehabilitate all aspects of the subject property to profitability.").

Defendants to execute mortgages on the Properties in certain scenarios: (1) Defendants obtained the power to sell the Properties at a judicial foreclosure sale; or (2) Defendants purchased the Properties at such a sale. (Opp'n at 7.)

Neither party has briefed the issue of whether Illinois law permits a party to grant a mortgage on a property simply because it could sell the property at a judicial sale. However, this court is not required to reach that issue at the motion to dismiss stage, because neither of the parties disputes that Anchor acquired title to the Properties at their judicial sales. (Compl. ¶ 25; MTD at 10.) Thus, according to FirstMerit's interpretations of the Collateral Assignments, Anchor was then required to deliver the mortgages, or the Collateral Assignments were to convert to mortgages. (Opp'n at 7.)

In any event, neither of Defendants' authorities supports the proposition that under Illinois law one party may not write an explicit contract granting another party a mortgage in a property potentially sold and acquired in foreclosure. In *Williams*, plaintiff attempted to turn an instrument that the court stated "appear[ed] to be an absolute warranty deed on its face" into a mortgage. 35 N.E.2d at 96. The *Williams* plaintiff had deeded his property to defendants to cancel a prior debt. *Id*. After oil was discovered on the property several years later, plaintiff attempted to convince the court that this deed was actually a mortgage, so that he could repay defendant and redeem the property. *Id*. Similarly, in *Burst*, a son had assumed his father's responsibility to make mortgage payments for a property, in exchange for a contract that the father would leave the property to his son in his will. 89 N.E.2d at 133-35. When the father remarried, he attempted to convey the property to his new wife as a joint tenant. *Id*. Upon the father's death, the second-wife argued the son's contract was a mortgage that could be redeemed. *Id*.

Simply put, unlike the relevant parties in *Williams* and *Burst*, FirstMerit is not alleging that a mortgage should be created out of basically whole cloth under suspicious circumstances. FirstMerit does not cite vague understandings or oral conversations about this conversion like the plaintiffs generally did in *Williams* and *Burst*. FirstMerit, here, alleges that Anchor agreed in the Assignments that those documents would convert to a mortgage in certain scenarios that have occurred. (Compl. ¶¶ 17-18.) More importantly, FirstMerit adequately alleges that specific provisions of the Collateral Assignments support this interpretation of the assignments. (*Id*.)

Defendants argue vigorously that at the time the Collateral Assignments were entered into they had no legal or equitable interest in the Properties and that they didn't even purchase the Properties in foreclosure until more than a year after the Collateral Assignments were signed. (Defs' MTD at 10.) However, Defendants provide no legal authority to support the argument that this is fatal to FirstMerit's claims.

If Defendants are generally arguing it is implausible the parties could anticipate Anchor acquiring the Properties in the future, this court is unconvinced based on the facts alleged. The facts plausibly lead to the inference that the entire purpose of the parties' agreements was to incentivize Defendants to acquire the Properties and discourage third-party bidders in foreclosure.

As discussed above, Anchor had already entered into agreements to borrow and pay approximately $4.027 million to acquire the Properties' outstanding loans and notes. (Compl. ¶¶ 11-13.) Defendant Tuluce had already extended a personal guarantee to repay that sum as well. (*Id*. ¶ 14.) When Defendants entered into these agreements, Midwest had already instituted foreclosure proceedings against the Properties. (*Id*. ¶ 19.) Upon Defendants entering into their various agreements with Midwest, Anchor was permitted to substitute in as a party plaintiff to

the foreclosure proceedings. (*Id*. ¶ 20.) Assuming these facts, it is implausible to conclude that Defendants would have allowed another buyer to sweep into the foreclosure and buy the Properties. Since Defendants were already obligated to satisfy the $4.027 Note, it is plausible that they would want the benefits of owning the Properties to repay that obligation.

Additionally, by the time the foreclosure sale occurred, the parties had already entered into the Collateral Assignments, which FirstMerit alleges obligated Anchor to convey a mortgage to Midwest upon the foreclosure sale. (*See* Compl. ¶¶ 19-25.) In the event a serious third-party bidder emerged, it is highly implausible that Anchor could have conducted the foreclosure sales without informing other potential bidders of this term. Even if Defendants disputed this term, they would have had to act very brazenly in failing to disclose it. Thus, as pled, the parties' agreements would also seem to plausibly create a chilling effect on potential third-party bidders.

Next, Defendants deny FirstMerit's interpretation of the Collateral Assignments, and argue that at best those agreements lead to a breach of contract claim. Defendants first note that the Collateral Assignments do not require "Defendants to provide Plaintiff with new mortgages", but rather simply "require[] Defendants to obtain Plaintiff's consent before it sells the Foreclosed Property". (MTD at 12.) After Defendants seek that consent, Midwest then "may condition its consent on Defendants providing Plaintiff with new mortgages". (*Id*.) Thus, according to Defendants, only if "Plaintiff subjects its consent of Defendants' right to sell the Properties on the delivery of the new mortgages, and Defendants fail to provide Plaintiff with the new mortgages" do "the Collateral Assignments get transformed into an actual mortgage." (*Id*.) To put this argument another way, if Defendants "breached the Assignments by failing to obtain the

consent of Plaintiff prior to selling the Properties, then Plaintiff lost its right to a mortgage." (Reply at 3.)

For purposes of this motion, nowhere do Defendants contest the following allegations. Defendant Anchor "failed to obtain Midwest's or FirstMerit's written consent to the judicial sales, as required by the three Collateral Assignments". (Compl. ¶ 26.) If Anchor sought Midwest's consent, by the terms of the Assignments, this could have been conditioned upon receiving new mortgages. (*Id*. ¶ 27.) Instead, Defendants essentially argue their own alleged breach of the Collateral Assignments (failure to seek consent) should benefit them (avoidance of the mortgages and foreclosures). (MTD at 12; Reply at 3.)

At the motion to dismiss stage, this court will not invalidate FirstMerit's well-pled facts, in favor of Defendants' currently implausible competing theory. Illinois courts have long held that courts are to construe contracts to give effect to the intent of the parties. *See, e.g., In re Marriage of Olsen*, 528 N.E.2d 684, 687 (Ill. 1988) ("When enforcing a contract, the primary objective is to construe the contract to ascertain the intent of the parties and to give effect to that intent."); *Dunlop v. Lamb*, 55 N.E. 354, 356 (Ill. 1899) (favorably quoting similar language). Additionally, Illinois courts have held that a party breaching a contract cannot pick and choose provisions benefiting him to enforce. *See, e.g., Goldstein v. Lustig*, 507 N.E.2d 164, 168 (Ill. App. Ct. 1st Dist. 1987) ("A party who materially breaches a contract cannot take advantage of the terms of the contract which benefit him".). This court is not currently convinced the parties intended that Anchor could breach the Collateral Assignments' consent provision and then benefit by avoiding its mortgage obligations.

Lastly, Defendants argue that Counts II, IV, and VI must fail on definiteness grounds. (MTD at 13-14.) According to Defendants, "[e]ven if this Court finds Defendants' purported

breach of the Enforcement Provision somehow transformed the Collateral Assignments into a 'mortgage', the allegedly newly transformed mortgages are legally deficient since there was no specific terms of the mortgage." (*Id*. at 13.)

At the motion to dismiss stage, this argument too must be rejected, because Defendants again attempt to benefit from their own breach. As pled, if the current terms of the Assignments as mortgages are at all indefinite, this must be construed against Defendants for their failure to live up to the obligation to seek consent and to deliver the mortgages. *See Schilling v. Stahl*, 918 N.E.2d 1077, 1081-82 (Ill. App. Ct. 2nd Dist. 2009) (reversing grant of summary judgment for indefiniteness of mortgage where defendants "failed to show up at the closing and present a mortgage" meaning "it would be difficult for anyone to dispute the 'missing terms' of a document that [defendants] failed to present.").[3]

Given that any indefiniteness, at this stage in the proceedings, must be attributable to Defendants, this court believes FirstMerit should have the opportunity to cure any definiteness defect through discovery. Defendants own authority supports the appropriateness of this holding. *See Lecioni v. Brill*, 365 N.E.2d 1169, 1171 (Ill. App. Ct. 2nd Dist. 1977) (dismissing claim of failure to deliver mortgage on indefiniteness grounds only after plaintiff had benefit of full trial).

---

[3] This court acknowledges that proceeding from the Assignments to the delivery of definite mortgages requires multiple factual inferences on its part, but nowhere in Defendants' briefing do they question the plausibility of these inferences. Defendants have not argued this court should strip FirstMerit of the plausible inference if Anchor had diligently sought consent Midwest would have insisted upon receiving mortgages. Instead, for the purposes of the motion to dismiss, Defendants' argument just proceeds from FirstMerit's allegation that Anchor failed to seek Midwest's consent. (*See* MTD at 12; Reply at 3.) The Defendants also do not argue they were unable to deliver sufficiently definite mortgages or at least negotiate them with Midwest. To the contrary, Defendants tout their own sophistication in engaging in commercial real estate transactions in their briefing. (*See, supra*, fn.2.)

That said, this court notes that FirstMerit already points to multiple provisions of the relevant documents which tend to plausibly support the definiteness of the alleged mortgages for purposes of a motion to dismiss. FirstMerit notes that the Collateral Assignments: (1) secure the $4.027 million loan Midwest made to Anchor (Opp'n at 8 (citing Compl. Exs. G, H, I, at 1)); (2) outline Defendants' liabilities and obligations (Opp'n at 9 (citing Compl. Exs. G, H, I, at 3-4)); (3) contain default provisions (*id.* at 5); (4) have notice provisions (*id.* at 6); and (5) reference the $4.027 Note, which provides the potential terms of the indebtedness, including interest rate and repayment (Opp'n at 9 (citing Compl. Exs. E at 1).)

2. <u>Counts X, XI, and XII – Foreclosure on the Properties Based on the $400,000 Note</u>

Again, Counts X, XI, and XII of the Complaint seek to foreclose upon the Properties, because Defendants failed to repay the $400,000 Note. (Opp'n at 2.)

Defendants first argue that these claims should be dismissed because Defendant Tuluce never intended to secure the $400,000 Note with mortgages on the Properties. (MTD at 14-15.) To support this argument, Defendants set forth a narrative outside of the complaint that again revolves around Tuluce being defrauded by Midwest. (*Id.*) This narrative is only supported through an affidavit filed by Mr. Tuluce. (*Id.*) This court will again exercise its discretion to exclude these matters from its consideration at the motion to dismiss stage. Fed. R. Civ. P. 12(d); *see also Beneficial Const. Co.*, 998 F. Supp. at 862.

Defendants next argue that whether the $400,000 Note secures the Properties is ambiguous and that this ambiguity should be resolved against FirstMerit, who succeeds the note's drafter Midwest. (MTD at 15.) Although the $400,000.00 Promissory Note and its restatements and amendments state that the Note is unsecured, the final $400,000.00 Promissory Note dated May 5, 2010 included the following provision:

> REQUIREMENT TO PLEDGE COLLATERAL. Borrower covenants and
> agrees with Lender, that as soon as possible, but in no event later than
> August 14, 20 10, Borrower will effectuate the transfer of title for the
> properties located at 410 Chestnut St., Hinsdale, Illinois; 187-191 York Rd.,
> Elmhurst, Illinois; and 4471 Lawn Ave., Western Springs, Illinois.
> Borrower further covenants and agrees to execute any and all Mortgages,
> Assignments of Rents and/or Related Documents necessary to create a valid
> and perfected security interest in said properties.

(Compl., Ex. J.)

At the same time Defendants executed this final $400,000.00 Promissory Note, they also executed second priority mortgages on the Western Springs, Elmhurst, and Hinsdale Properties in favor of Midwest. (*Id.,* Exs. M, N, 0.) These second priority Mortgages clarify that they secure the "promissory note dated May 5, 2010, in the original principal amount of $400,000.00". *Id.*

Nothing about the above language or these documents is ambiguous. Instead, Defendants agreed to execute mortgages securing the $400,000.00 Note by a certain date, and they complied with this agreement. Because the final $400,000.00 Promissory Note indicates Defendants' intent to secure the Note, and because Defendants' executed three mortgages at the same time they executed the $400,000.00 Promissory Note, the $400,000 Note is not ambiguous. Thus, Defendants' motion to dismiss Counts X, XI, and XII must be denied.

<u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss (Dkt. No. 20) is denied in its entirety. Defendants' amended answer including all counts is due 2/24/2014. The parties are to confer and file a joint Form 52 proposed pretrial schedule on or before 2/24/2014. The case is set for report on status and entry of a scheduling order on 2/27/2014 at 9:00 a.m. The parties are encouraged to discuss settlement.

ENTER:

_James F. Holderman_

JAMES F. HOLDERMAN
United States District Judge

Date:   February 14, 2014